JABAR, J., dissenting.
[¶ 29] I respectfully dissent because the trial court used the wrong legal standard to determine whether Deborah established standing under the Grandparents Visitation Act (GVA), 19-A M.R.S. §§ 1801 - 1805 (2017). The trial court's decision hinged upon whether Deborah established standing as a de facto parent to the child. This is not the proper test to be applied by the trial court in order to determine standing in a GVA case. Because it was the trial court that mistakenly introduced the issue of de facto parenthood, our review must focus on whether Deborah has established standing pursuant to the GVA and not pursuant to the principles of de facto parenthood.
*1287 A. The Trial Court's Application of the Wrong Standard
[¶ 30] Although Deborah's cause of action was for contact pursuant to the GVA, the Court's opinion repeatedly refers to Deborah's attempts to establish standing by proving that she was a de facto parent. Court's Opinion ¶¶ 1, 4, 7, 9, 20. For example, the Court refers to Deborah as "a putative de facto parent" to the child, states that Deborah's "submissions to the court ... introduced concepts that are specific to the law of de facto parenthood," and asserts that even though "Deborah commenced this action pursuant to the GVA," she "raised the specter of de facto parenthood." Court's Opinion ¶¶ 1, 9, 20. The Court also references the language at the very end of Deborah's petition-that she was seeking "primary physical residence" of the child-as support that she was seeking a de facto parenthood adjudication, and yet in footnote four, the Court acknowledges that Deborah was not seeking primary physical residence of the child. Court's Opinion ¶¶ 4, 7 n.4.
[¶ 31] The record, however, does not support these assertions by the Court. Because a trial court's decision on standing is based on the pleadings without a hearing, see 19-A M.R.S. § 1803(2)(C) (2017), we must look to the documents that were presented to the trial court prior to its decision. In Deborah's petition for contact pursuant to the GVA and her accompanying affidavit, there is no reference whatsoever to the term de facto parentage or the Maine Parentage Act. See 19-A M.R.S. § 1891 (2017). In response to Deborah's GVA petition, Corrie filed a motion to dismiss with an accompanying affidavit. In this responsive pleading, which incorporated a memorandum of law, there is also no reference to the term de facto parentage. The memorandum of law cites and analogizes to our case Robichaud v. Pariseau , 2003 ME 54, 820 A.2d 1212, which is a GVA case that does not involve de facto parentage issues.
[¶ 32] Without any further documents presented to the court by Deborah or Corrie, the trial court for the first time mistakenly referenced de facto parentage when it concluded that Deborah had failed to make a prima facie showing that she was a de facto parent to the child and that she therefore lacked standing to proceed. In its order dismissing Deborah's petition for visitation, the trial court concluded that
Petitioner has not shown de facto parent status, and thus cannot constitutionally pursue visitation rights under the Grandparents Visitation Act.
Accordingly ... the court declines to find that she has made a prima facie showing of de facto parentage as required for her to establish standing under the Grandparents Visitation Act.
[¶ 33] In response to the court's order, Deborah filed a motion for reconsideration and requested an alteration of the court's decision, and it was at that point, for the first time, that Deborah referred to de facto parentage and the legal precedents cited by the trial court in its order. It is obvious that she was trying to bring the facts of her case under the umbrella of de facto parentage as a result of the trial court's improper application of that standard. It is wholly inaccurate to imply, in any way, that Deborah's case strategy was the reason the trial court incorrectly applied the de facto parentage standard to determine whether Deborah had standing to proceed. Of its own volition, the trial court steered this case onto a side track dealing with de facto parentage where it did not belong; it is a mistake for us to continue down that track.
[¶ 34] Although Deborah's post-judgment motion filed in the trial court and her brief on appeal construe her arguments in *1288 terms of de facto parentage, that legal strategy is the logical outgrowth of the trial court's erroneous application of the de facto parentage framework to Deborah's initial GVA petition. I must reiterate that upon the GVA petition and the responsive pleading, neither Corrie nor Deborah ever mentioned de facto parentage, and it is entirely unnecessary for this Court, upon appellate review, to consider Deborah's arguments regarding de facto parentage-which she advanced only after the court improperly introduced this concept into the case-as the precursor to her GVA petition.
[¶ 35] In the end, it should not make any difference who raised the issue of de facto parentage-the trial court used the wrong legal standard when it failed to assess standing in this case pursuant to a GVA analysis. Because this is a GVA case, and not a de facto parenthood case, the statutory requirements for standing pursuant to the GVA should be the only issue that we consider in our review.
B. The Proper Standard and its Application to this Case
[¶ 36] In 1991, the Legislature first enacted the Grandparents Visitation Act.[13] See P.L. 1991, ch. 414 (effective Oct. 9, 1991) (codified at 19 M.R.S.A. §§ 1001 - 1005 (Supp. 1991) ). Our opinions construing the GVA have effectively made it impossible for grandparents to establish standing. See Dorr v. Woodard , 2016 ME 79, ¶¶ 29-43, 140 A.3d 467 (Jabar, J., dissenting) (discussing the demise of each possible avenue to establish standing pursuant to the GVA). Regardless, I believe that the GVA-which has neither been repealed by the Legislature nor held facially unconstitutional by this Court-and its statutory requirements should control our analysis.
[¶ 37] In Robichaud , the leading case cited by Corrie in her motion to dismiss, we interpreted the GVA, without reference to de facto parenthood, as requiring three safeguards against the intrusion into a parent's fundamental rights:
The safeguards include that: (1) a grandparent must establish standing before litigation may commence on a petition, (2) the court must consider any objection of the parents concerning an award of rights of visitation or access by the grandparents (giving life to the presumption that parents act in the best interests of their children), and (3) the court may not grant visitation if doing so would significantly interfere with any parent-child relationship or with the parent's rightful authority over the child.
2003 ME 54, ¶ 8 n.2, 820 A.2d 1212 (quotation marks omitted). The first safeguard, and the only one relevant to this case at this stage, is that the grandparent must establish standing before litigation may commence. See id. ; see also 19-A M.R.S. § 1803(1)(A)-(C). Pursuant to section 1803(1)(B), a grandparent may petition the court for reasonable rights of visitation or access if "a sufficient existing relationship" exists "between the grandparent and the child." In Robichaud , we held that in order to comply with the constitutional protections afforded parents, grandparents must *1289 establish that "urgent reasons" exist. 2003 ME 54, ¶¶ 7, 10, 820 A.2d 1212. Implicit within the test set forth in Robichaud was the concept that the "urgent reasons standard presupposes extraordinary contact between a grandparent and grandchildren to satisfy the constitutional requirement of a compelling state interest to interfere with parents' right to care for and control their children." Id. ¶ 10 (quotation marks omitted).
[¶ 38] Although the test set out in Robichaud does not require any finding of de facto parenthood, some of our cases following Robichaud have led to confusion regarding the intersection of the law governing de facto parentage and grandparent visitation.[14] In some of those cases, we have held that the establishment of de facto parentage status meets the "extraordinary contact" test set forth in Robichaud , see, e.g. , Davis v. Anderson , 2008 ME 125, ¶ 19, 953 A.2d 1166 ; Dorr , 2016 ME 79, ¶ 17, 140 A.3d 467, but just because the establishment of de facto parentage will satisfy the "extraordinary contact" test does not mean that the de facto parentage test is the proper test to apply when evaluating a case brought pursuant to the GVA. In order to gain standing pursuant to a de facto parentage claim, the petitioner must meet a much higher bar than the petitioner must meet pursuant to the GVA.
[¶ 39] In Dorr v. Woodard and Davis v. Anderson , for example, we clearly indicated that there may be other cases that fall short of the stringent requirements of de facto parentage but nevertheless may still pass the "urgent reasons" or "extraordinary contact" test of Robichaud . In Dorr , we stated that "[t]o date, the only urgent reason that we have articulated" is the test for de facto parentage, but "[i]t is possible that in some circumstances, a grandparent's sufficient effort to establish a relationship with her grandchild could pass constitutional muster and demonstrate urgent reasons .... However, we are not called upon here to define all instances where a compelling interest could be demonstrated." 2016 ME 79, ¶¶ 17, 24, 140 A.3d 467 (emphasis added) (quotation marks omitted). In Anderson , we stated that aside from de facto parentage, "[n]o other urgent reasons have yet been identified." 2008 ME 125, ¶ 15, 953 A.2d 1166 (emphasis added).
[¶ 40] Here, the pivotal issue is whether Deborah established "extraordinary contact" with her grandchild. See Robichaud , 2003 ME 54, ¶ 10, 820 A.2d 1212. Using the de facto parentage test creates a much higher bar than necessary to establish standing in a GVA case. Because this is a GVA case not involving any claim for de facto parenthood, and the trial court used the wrong legal standard, we should remand for the trial court to consider the pleadings using the proper "extraordinary contact" standard articulated in Robichaud .
[¶ 41] Although the Court acknowledges that the trial court used the wrong legal standard to determine Deborah's standing, it does not remand the case to the trial court to determine standing using the proper standard. Court's Opinion ¶ 9. Rather, the Court, as a matter of law, concludes that Deborah has failed to establish standing under the GVA. Court's Opinion ¶¶ 9, 21. In this, I strongly disagree. If we are to review the affidavits and the facts presented in the affidavits, *1290 then I believe that Deborah has established "extraordinary contact" with her grandchild such that she has standing to proceed on her petition.
[¶ 42] At the outset, it is important to note that standing does not afford Deborah an entitlement to relief under the GVA-it only establishes that she has had a close enough relationship with the child such that she is entitled to be heard regarding whether it is in the child's best interest that she have contact with the child. See 19-A M.R.S. § 1803(2)-(3). Once standing has been established, the trial court addresses the best interest of the child. See id. It is at that point in the proceeding that the trial court would consider the second and third safeguards enunciated in Robichaud :
(2) the court must consider any objection of the parents concerning an award of rights of visitation or access by the grandparents (giving life to the presumption that parents act in the best interests of their children), and (3) the court may not grant visitation if doing so would significantly interfere with any parent-child relationship or with the parent's rightful authority over the child.
2003 ME 54, ¶ 8 n.2, 820 A.2d 1212 (quotation marks omitted). After consideration of these safeguards and the best interest standard, the trial court may conclude that the grandparents are not entitled to any contact or are entitled to only limited contact.[15] As to the standing issue, the focus is only on the relationship between the grandparent and the child.
[¶ 43] In Robichaud , we indicated that the focus is on the existing or historical contact between the grandparent and the child to determine whether that contact is "extraordinary." 2003 ME 54, ¶ 10, 820 A.2d 1212. The grandmother in Robichaud described her contact as occasional visits with the grandchildren, with visits sometimes lasting one day to one week over about a three-year period. Id. ¶ 6. The trial court there found that the contact described typified the type of contact that "one would anticipate from a connected, extended family." Id . (quotation marks omitted). We agreed and concluded that this level of contact was "intermittent" and therefore did not show that the grandmother had had extraordinary contact with the grandchildren. Id. ¶ 10. Similarly, in Dorr , we decided that the facts-the grandmother attended a baby shower for the child, went to the hospital the evening that the child was born, and had some unspecified amount of contact with the child-did not establish a sufficient existing relationship to confer standing. 2016 ME 79, ¶¶ 4, 20, 140 A.3d 467.
[¶ 44] This case is very different. The relationship between Deborah and the child was anything but ordinary or intermittent. Unlike the grandmother in Robichaud , Deborah's contact was extraordinary and not typical. The following facts, which are not contested, are contained in the grandmother's affidavit: Corrie and the child lived with her, full time, for the first two years of the child's life. When Corrie moved out, she moved only a half-mile away, and Corrie and the child had contact with the grandparents several days a week. Deborah had the child with her at least one day per week and most weekends for the first several years of the child's life. As soon as the child was old enough for daycare, Deborah had him two days per week while Corrie was at work, and Deborah *1291 saw him almost every weekend. When the child started school, she would meet him at the bus on Wednesdays and feed him dinner. Deborah spoke with the child on the phone and through other electronic media several days per week. This close relationship continued for eight years until December of 2016, when a conflict arose between Corrie and Deborah because of Corrie's boyfriend. Later, after the child's grandfather, Deborah's husband, died, Corrie and the child moved in with Deborah for almost a month. This contact between Deborah and her grandchild was regular, close, and intensive; it was far from "typical." See Court's Opinion ¶ 23; Katon v. Brandi M. , 2011 ME 131, ¶¶ 2-3, 32 A.3d 1047. In fact, it is the exact type of "secure, stable and beneficial" relationship that the Legislature intended to permit grandparents to preserve and maintain through its enactment of the GVA. See supra n.13.
[¶ 45] Although these facts would not entitle the grandmother to de facto parenthood status-a status she never requested-the grandmother's relationship with the child far exceeds that which is typical of a "connected, extended family" and is exactly the kind of "sufficient existing relationship" the Legislature intended should give rise to grandparent standing to seek visitation. If called upon to make a conclusion from the facts contained in the affidavit-which would be unnecessary were we to remand so that the court could apply the proper legal standard-we should conclude that Deborah has established standing to proceed on her petition. Therefore, she should be entitled to make her case in court that some level of contact between her and the grandchild is in the child's best interest.
C. Conclusion
[¶ 46] We should remand for the trial court to apply the proper "extraordinary contact" standard enunciated in Robichaud . Alternatively, we should conclude as a matter of law that Deborah has demonstrated that she has had extraordinary contact with the child and therefore has a sufficient existing relationship to establish standing pursuant to section 1803 of the GVA such that she may proceed on the merits of her petition.

In enacting the GVA, the Legislature demonstrated its belief that the maintenance of the relationship between the grandparent and the grandchild is in the best interest of the child in certain cases, and that that relationship is something of value from the child's perspective. See L.D. 1307, Statement of Fact (115th Legis. 1991) ("All children are entitled to enjoy secure, stable and beneficial relationships with their grandparents and to maintain these relationships .... The bill allows the court to maintain the relationship between a grandchild and that grandchild's grandparents when it is in the grandchild's best interest and does not interfere with a parent-child relationship.").

Although the Court's opinion gives a thorough explanation of de facto parenthood, it is unnecessary and, more importantly, it adds to the confusion that this line of cases has created. Other than holding that the trial court erred by using the standard for de facto parenthood in a GVA case, there is no need to discuss de facto parenthood.

The Court discusses Corrie's boyfriend in its opinion, see Court's Opinion ¶ 24, but that discussion is misplaced at our stage of appellate review because although it may be relevant to what is in the child's best interest, it is irrelevant to the issue of standing. The child's best interest is not before us today.